UNITED STATES DISRICT COURT  
EASTERN DISTRICT OF NEW YORK

Case No.:

COMPLAINT

ROWE PLASTIC SURGERY OF LONG ISLAND, PC  &  
NORMAN MAURICE ROWE, MD , MHA, LLC  
                              Plaintiff,

      - Against -

OXFORD HEALTH INSURANCE, INC., and  
UNITEDHEALTH GROUP INCORPORATED  
                            Defendant(s).

By and through their attorneys Plaintiffs, ROWE PLASTIC SURGERY OF LONG ISLAND, PC  & NORMAN MAURICE ROWE, MD , MHA, LLC, alleges:

## Introduction

1)  This is an action by a non-participating health care provider[1] to recover amounts due from an insurer. To induce Plaintiff to render certain medical services the Defendant-insurer offered to reimburse services rendered by a non-participating health care provider at the network benefit level.  After the services were rendered the insurer reneged by not reimbursing the services at the network benefit level and reimbursing less than a reasonable amount.

2)  The Defendant-insurer has already adjudicated these claims, has determined that the services rendered were covered medical services, and has issued payments-payments that were not what was offered to induce performance of the services at issue. And, that is the reason for this lawsuit.

---

[1] Sometimes known as an out-of-network provider

3)  TP[2], a consumer of the Defendants' insurance product, required a medical procedure called bilateral breast reduction. The insurance product Oxford sold did not provide  TP with out-of-network benefits and Oxford had no "participating provider" in TP's area to render bilateral breast reduction to TP.

4)  In order to induce Plaintiff(s), a non-participating provider, to render bilateral breast reduction to TP, the insurer offered to reimburse the service at the network benefit level. But after receiving the benefit of its bargain-bilateral breast reduction rendered to its consumer-the insurer reneged by making payment that was unreasonable. The payment was not at the network benefit level, was late pursuant to New York statutory standards, and incomplete or unreasonable according to industry standards.

## JURISDICTION, VENUE, AND PARTIES

5)  This Court has jurisdiction over this case pursuant to 28 U.S.C. §1332(a)(1), which provides, in pertinent part, that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between … citizens of different States."

6)  Defendant OXFORD HEALTH INSURANCE, INC., (herein after " Oxford") is a Connecticut corporation.  Oxford transacts insurance business in Nassau and Suffolk Counties, New York.

---

[2] TP is an individual patient referred to solely by their initials to avoid disclosure of personally identifiable information.

7)  Defendant UNITEDHEALTH GROUP INCORPORATED (herein after "UHG"), is a Delaware corporation with its principal place of business in Minnetonka, Minnesota. UHG transacts insurance business in Nassau and Suffolk Counties New York

8)  Upon information and belief, Oxford is a wholly owned subsidiary of UHG

9)  ROWE PLASTIC SURGERY OF LONG ISLAND, P.C. (Herein after "RPSLI") is a New York Professional Corporation that provides medical services in Nassau and Suffolk Counties, New York. RPSLI is an entity through which Dr. Lisa Schneider does business.

10) NORMAN MAURICE ROWE, M.D., M.H.A., L.L.C. (Herein after Rowe LLC) is a Limited Liability Company whose principal share holder is a New York Resident. Rowe LLC transacts business in Nassau and Suffolk Counties, New York. Rowe LLC is an entity through which Dr. Nroman Rowe does business.

# FACTUAL ALLEGATIONS

## A.  Introduction to Managed Care

11) A health insurance product is a package of health insurance coverage benefits that are offered using a particular product network type within a service area.

12) Health insurance plans, with respect to a product, are the pairing of the health insurance coverage benefits under the product with a particular cost sharing structure, provider network, and service area.

13) Many of RPSLI and Rowe LLC's patients are consumers of a health insurance products and use those products to arrange for and manage the costs of their medical treatment

14) At all relevant times, " TP" was a consumer of a health insurance product sold by Oxford.

15) TP relied on an insurance product sold by Oxford to arrange for and manage the costs of their medical treatment.

### 1. Use of Network Status to Determine Reimbursement

16) The amount Oxford pays to medical providers is the result of a negotiation that takes place between medical providers and Oxford long before any services are rendered, a negotiation that fixes a provider's network status.

17) Oxford determines a medical provider's network status by whether or not the provider has signed an Oxford network agreement. A provider who has signed the agreement has joined Oxford's provider network and is referred to as a participating provider. A participating provider has negotiated and agreed to accept a rate of payment for the services they will provide to consumers of Oxford's products and plans.

18) The pre-negotiated rates Oxford pays for in-network services are not found within the terms of any insurance product or plan certificate, they are found in the network agreements.

19) Oxford negotiates the terms of the network agreement with medical providers but sells specific insurance plans to consumers.

20) The in-network rates Oxford pays is not found within any discrete insurance product or plan Oxford sells and/or administers.

21) The amounts Oxford uses to pay providers who render the same or similar services as RPSLI and Rowe LLC is known to Oxford and can be ascertained through discovery.

22) RPSLI and Rowe LLC intentionally refused to join any provider network organized by Oxford so that RPSLI and Rowe LLC are always free to negotiate payment for services they render to individual patients.

23) At all times relevant, RPSLI and Rowe LLC refused to join any insurer provider network organized by Oxford so that RPSLI and Rowe LLC could freely choose to whom they would render medical services.

24) RPSLI and Rowe LLC intentionally refused to join any insurer provider network organized by Oxford so that RPSLI and Rowe LLC could never be bound by the terms and conditions of Oxford's or any health insurance plan or product sold by Oxford.

25) RPSLI and Rowe LLC never agreed to be bound by the terms and conditions of TP's health insurance plan.

26) Since RPSLI and Rowe LLC have refused to join a provider network Oxford treats RPSLI and Rowe LLC as non-participating providers.

27) Oxford and UHG know or should know that the healthcare industry uses the term "usual, customary, and reasonable" ("UCR") to mean the charge for a service in a geographic area based on what providers in the area usually charge for the same or similar medical services.

28) Typically, an insurer will disclose the total allowed amount as a percentage of UCR or some other phrase composed of the words usual, customary, and reasonable, e.g., reasonable and customary.

29) Oxford and UHG know or should know the 80th percentile of providers' charges in a geographic area for the same or similar service is a percentile threshold recognized in the health insurance industry as a reasonable value for that medical service.

30) Oxford and UHG know or should know that New York Insurance Law § 4324 recognizes the 80th percentile of providers' charges in a geographic area for the same or similar service as the usual and customary cost for that service.

31) Oxford and UHG know or should know that the FAIRHealth Database is recognized in the healthcare industry as a reliable source for provider pricing. The 80th percentile of FAIRHealth data is recognized in the healthcare industry as a reliable source for UCR.

### 2.  Network Exceptions

32) A network exception from Oxford is an offer to reimburse a medical service, which is rendered to the relevant patient within a specific time period by an a non-participating provider, at a rate the patient is not otherwise entitled to receive.

33) TP had no out-of-network benefits, therefore, TP would have had to pay the entire costs of the surgery out of their own pocket.

34) Oxford offers network exceptions to induce highly skilled physicians to render unique medical services to consumers of Oxford's insurance productswith no out-of

network benefits by intentionally offering to reimburse the service at the network benefit level.

35) The services RPSLI and Rowe LLC renders are unique because RPSLI and Rowe LLC's physicians are specially trained in the latest techniques and methods of performing breast reconstruction surgery that result in reduced trauma and higher quality patient care.

36) A Network exception from Oxford is different than a "pre-authorization." Pre-authorizations establish there is coverage for the service.  Network exceptions from Oxford, on the other hand, are offers by Oxford for reimbursement in exchange for rendering medical services.

37) Oxford has a business procedure for issuing network exceptions.

38) RPSLI and Rowe LLC have successfully obtained numerous network exceptions from Oxford.

### 3.  *RPSLI and Rowe LLC requested a Network Exception*

39) Bilateral breast reduction was indicated for TP and TP desired RPSLI and Rowe LLC to perform bilateral breast reduction.

40) RPSLI and Rowe LLC, however, were unwilling to risk non-payment to perform bilateral breast reduction on TP.

41) Therefore, on or about February 1, 2021, an RPSLI and Rowe LLC employee contacted Oxford and spoke to an individual in Oxford's surgical pre-approval department or unit. RPSLI and Rowe LLC identified itself as a non-participating

provider, indicated to Oxford that bilateral breast reduction was indicated for TP, and that RPSLI and Rowe LLC was willing to negotiate payment for their services.

42) On February 25, 2021, RPSLI and Rowe LLC submitted to Oxford clinical information and certain medical records concerning the surgery proposed for TP.

43) Those records informed Oxford that bilateral breast reduction was indicated for TP and that Dr. Norman Maurice Rowe  and Dr. Lisa Schneider would be performing bilateral breast reduction.

44) Oxford knows or should know that the submission of those records indicated that neither provider was willing to render the services unless they were reimbursed.

45) On or about March 18, 2021, Oxford verbally informed an RPSLI and Rowe LLC employee that bilateral breast reduction was a covered service and that if bilateral breast reduction was rendered to TP it would be reimbursed at the network level.

46) Reimbursement at the network level means the patient's only out-of-pocket costs are the co-pay and the deductible.

47) Upon information and belief, Oxford notified TP that it had received RPSLI and Rowe LLC's request for a network exception and based on information provided by RPSLI and Rowe LLC it had granted RPSLI and Rowe LLC's request.

48) Upon information and believe Oxford informed TP that when Oxford arranges for covered services rendered by a non-participating provider the "Allowed Amounts" , i.e., the amounts Oxford determined it will pay for a covered service, are

the billed charges unless lower amount is negotiated by Oxford or authorized by state law.

49) On May 26, 2021,  RPSLI and Rowe LLC accepted Oxford's offer by rendering bilateral breast reduction to TP.

50) RPSLI and Rowe LLC submitted its billing to Oxford.

## B.  Explanation of billing

51) RPSLI and Rowe LLC billed Oxford a total of $300,000.00 for the services rendered to TP on May 26, 2021 indicating the services it rendered using industry standard billing codes, known as "CPT codes." RPSLI and Rowe LLC also substantiated the use of those CPT codes by including the surgical/operative report with its billing.

52) Oxford knows or should know that it is an industry standard practice for Oxford to rely upon the billing codes submitted by a medical provider to determine the amount Oxford would pay.

53) Indeed, RPSLI and Rowe LLC attested to the accuracy of the claims.

54) RPSLI and Rowe LLC billed Oxford $150,000.00 for the services Dr. Norman Maurice Rowe rendered. Oxford adjudicated these claims and determined that the claims were for covered services rendered to TP because Oxford paid  $6,491.80 for the services Dr. Norman Maurice Rowe rendered.

55) RPSLI billed Oxford $150,000.00 for the services Dr. Lisa Schneider rendered. Oxford paid $1,038.70 for the services Dr. Lisa Schneider rendered.

C. *Oxford's fraudulent inducement scheme*

56) Oxford has a concrete business purpose in having highly skilled physicians render unique and medically necessary medical services that are NOT otherwise available to consumers of its health insurance products.

57) Oxford holds itself as having the capacity to arrange for and manage the costs of all necessary medical treatment for consumers of its products by maintaining a network of doctors that it claims will result in significant out-of-pocket savings to its consumers. Unbeknownst to its consumers, Oxford doesn't have highly skilled doctors like RPSLI and Rowe LLC in its network.

58) Oxford uses network exceptions to fraudulently induce highly skilled medical providers, like RPSLI and Rowe LLC, who have refused to join their provider network, to render services to consumers of Oxford's products. The network exception benefits Oxford by satisfying its obligation to consumers of its health insurance products to have a sufficient network capacity to arrange for necessary medical procedures.

59) The network exception benefits Oxford because Oxford can tell its consumer that it has limited the insured's out-of-pocket liability by making the medical providers receiving the network exception agree not to balance bill the patient as a condition of the network exception. Balance billing is the practice of seeking payment from the patient for the difference between an insurer's payment and an out-of-network provider's charge.

60) Without issuing the network exceptions Oxford's consumers could not receive the medical treatment they require without incurring significant out-of-pocket

costs. And if Oxford cannot arrange for necessary medical treatments then its products don't serve their function and its brand value decreases.

61) By creating a process for out-of-network providers to make a request for a network exception Oxford fostered a false sense of security in the requesting provider that Oxford was "on notice" that the out-of-network provider was expecting reimbursement.

62) When it granted the network exception for the services rendered to TP Oxford never intended to pay anything more than a fraction of the reasonable value of the services rendered.

63) Oxford's representation of reimbursement at the network level was intended to deceive RPSLI and Rowe LLC because Oxford has no in-network rate for services provided by out-of-network providers.

64) Oxford induced RPSLI and Rowe LLC to believe that reimbursement at the network level would be an amount negotiated by fellow medical providers in the same field in the same geographical area; an amount at least equal to UCR.

65) Oxford has, as is common in the health insurance industry, largely automated its claims adjudication process. Oxford has designed and implemented its automated claims adjudication process to ensure that claims for payment received by Oxford for all services rendered by out-of-network providers are intentionally underpaid.

66) When it comes to claim processing, Oxford knows or should know that the automated process is conveniently ignorant of the existence of a network exception,

yet disingenuously astute of a medical provider's network status. With the result that RPSLI and Rowe LLC are often mistakenly reimbursed as a non-participating provider despite the well documented negotiations between RPSLI and Rowe LLC and Oxford, which resulted in a promise to be reimbursed as in-network.

67) As a result of Oxford's deception, RPSLI has had to commence numerous lawsuits against Oxford 'to recover the balance owed.

68) Oxford intentionally underpays out-of-network providers to artificially reduce gross costs for medical services, increase profits, and to wage economic war on a non-participating provider providers who render treatment to their consumers.

*69)* Every dollar that Oxford was obligated to pay that it didn't pay was a dollar counted directly to profits. While underpayment serves as a windfall for Oxford, being tricked into providing medical services leaves the medical provider with a broken promise and the legal bills associated with attempting to be made whole again.

**D.  *Oxford intentionally automated its claims adjudication process so that it was intentionally ignorant of, or purposefully obtuse towards, its underpayment of network exceptions***

70) When Oxford processes the billing it receives it relies on the information reflected in the claim itself, and particularly the procedure code, to determine the service provided to the consumer, date the services were provided, and the medical provider's network status.

71) CPT codes are among the most important pieces of information included in a claim to Oxford, and a primary determinant of the amount Oxford will ultimately pay.

72) Oxford intentionally fails to reimburse an out-of-network provider as in-network after making a network exception.

73) Between 2018 and 2022, the rate at which Oxford issued improper reimbursement to RPSLI and Rowe LLC after issuing a network exception, and the degree to which the reimbursements Oxford made were inconsistent, foreclose the possibility that Oxford merely made bunches of honest mistakes.

74) The delta between what Oxford paid on the claim identified in the Complaint and what the Oxford should have paid is substantial.

75) Another facet of its scheme was Oxford's planned response to any disagreement regarding the rate of payment. Oxford knew that only the plan member or beneficiary could challenge a coverage determination made by Oxford. Therefore, Oxford would seek to cover-up its fraud by intentionally claiming, improperly, that determination of the in-network reimbursement requires reference to the certificate of coverage or the insurance plan of the relevant patient, an action only a plan beneficiary or member could bring against the plan sponsor, in most cases the patient's employer. And, an unlikely action considering the plan member or beneficiary already received the required medical service.

76) Oxford attains its goal of defending its underpayment by intentionally and improperly claiming that determination of the amount Oxford  owes for services

rendered to a network exception requires an impermissible reference to a certificate of coverage or the insurance plan of the relevant patient.

**E. This is not a right to payment case because Oxford issued a partial payment, which acknowledge RPSLI and Rowe LLC's right to payment**

77) Oxford did not do what it was required to do.

78) Oxford did not deny RPSLI and Rowe LLC's claim because  RPSLI and Rowe LLC incorrectly performed bilateral breast reduction.

79) Oxford did not deny the claim because the services RPSLI and Rowe LLC billed were not covered.

80) Oxford did not deny the claim because there was a reduction in TP's benefits such that RPSLI and Rowe LLC were not entitled to payment.

81) Oxford did not deny the claim because another insurer or corporation or organization was liable for all or part of the bill.

82) Oxford ultimately issued payment that was late and unreasonable.

83) With its payment to Rowe LLC for the services Dr. Norman Rowe rendered Oxford stated "You do not participate in our network. The allowed amount for the services is intended to resolve this claim. The member is responsible only for the copayment, coinsurance and deductible amounts shown on this remittance advice statement."  The remittance advice statement said the member was responsible for zero dollars.

84) With its payment to Rowe LLC for the services Dr. Norman Rowe rendered Oxford also stated "The claim was processed using your contracted rate."

85) With its payment to RPSLI for the services Dr. Lisa Schneider rendered Oxford stated "Benefits for this service were paid according to the member's benefits using a percentage of the medicare rate where available for the service provided."

86) With its payment to RPSLI for the services Dr. Lisa Schneider rendered Oxford also stated, 'The claim was processed using your contracted rate."

87) Oxford was asked to reconsider the claims Rowe LLC and RPSLI submitted for the services rendered to TP. The following images are fair and accurate excepts taken from Oxfords' response to that request for reconsideration

Allowed Amounts are the amount we determine that we will pay for the services or supplies Covered under this Certificate before any applicable cost-sharing is subtracted. For Participating Providers, except for your cost sharing obligations, you are not responsible for any difference between Allowed Amounts and the amount the provider bills. Allowed Amounts are determined solely in accordance with our reimbursement policy guidelines, as described in the Certificate.

● For Participating Providers, Allowed Amounts are based on the following:


● When Covered Services are received from a Participating provider, Allowed Amounts are our contracted fee(s) with that provider.

● When Covered Services are received from a non-Participating Provider as a result of an Emergency or as arranged by us, Allowed Amounts are billed charges unless a lower amount is negotiated by us or authorized by state law. Please contact us if you are billed for amounts in excess of your applicable cost-sharing. We will not pay excessive charges or amounts you are not legally obligated to pay.

88) In response to the request for reconsideration for the services rendered to TP Oxford also stated that "This claim has been reimbursed using Data iSight, which utilizes cost data if available (facilities) or paid data (professionals)."

89) Oxford admitted it did not reimburse the services at the network benefit level for bilateral breast reduction, therefore, Oxford incorrectly calculated its payment to RPSLI and Rowe LLC; as a result RPSLI suffered damages

90) The amount paid to RPSLI and Rowe LLC by Oxford, $7,530.50, is not a reasonable value for bilateral breast reduction because it is not consistent with the UCR for bilateral breast reduction; as a result RPSLI and Rowe LLC suffered damages.

91) Oxford did not properly apply industry coding standards for determining any recognized limitations on reimbursement for bilateral breast reduction when performed by two doctors, therefore, Oxford incorrectly calculated its payment to RPSLI and Rowe LLC; as a result RPSLI and Rowe LLC suffered damages.

## UHG OWN CONTROLS AND DIRECTS OXFORD

92) Defendant UHG is the parent corporation of Oxford.

93) Oxford acts in concert under the direction and control of UHG.

94) UHG designed and implemented a scheme to unjustly enrich itself and Oxford by controlling and directing Oxford to pay Rowe LLC and RPSLI at rates below the reasonable value of the bilateral breast reduction. Defendant UHG did so in order to generate additional and substantial fees based upon purported "savings" it would provide to purchasers of its insurance products.

95) UHG's scheme was to increase the difference between the amount that would otherwise be owed (often defined as Plaintiff's billed charges in the agreements

between the purchaser of the policy and Oxford) and the amount allowed or paid on the claims at issue. In short, the less Oxford paid to Rowe LLC and RPSLI, the more money UHG and Oxford made.

96) UHG benefited from Oxford's failure to reimburse Rowe LLC and RPSLI the reasonable value of the services provided.

97) UHG received dividends and administrative fees and reimbursements generated by Oxford's adjudication of medical claims, including the claims submitted by Rowe LLC and RPSLI.

98) Regardless of whether UHG is responsible for administering any health benefit plans or adjudicating any health benefit claims, UHG benefitted financially from Oxford's adjudication of Rowe LLC and RPSLI's claims for payment.

## A. OXFORD'S USE OF "SHARED SAVINGS PROGRAMS" TO UNJUSTLY ENRICH ITSELF S AND UHG

99) Under the "shared savings programs" Oxford keeps a percentage of the difference between the amount that would have otherwise been payable to the out-of-network provider and the amount allowed or paid by Oxford to adjudicate the claim.

100) Oxford then kicks up part of the revenue generated by the shared savings programs to UHG.

101) Oxford and UHG use the "shared savings programs" to suppress reimbursement rates and generate additional fees. A key component of its shared savings program is the automated claims adjudication process, discussed *supra*.

## FIRST CAUSE OF ACTION- BREACH OF CONTRACT

102)      RPSLI and Rowe LLC repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

103)      On or about March 18, 2021, Oxford offered to reimburse at the highest in-network rate bilateral breast reduction if RPSLI and Rowe LLC rendered that service to TP.

104)      On or about May 26, 2021, RPSLI and Rowe LLC accepted Oxford's offer by rendering bilateral breast reduction to TP and submitted its billing to Oxford.

105)      Because Oxford arranged for RPSLI and Rowe LLC to render the services and did not reject  RPSLI and Rowe LLC's performance Oxford, therefore, entered into an agreement with RPSLI and Rowe LLC that was independent of any obligation Oxford owed to TP.

106)       Oxford is, therefore, obligated to reimburse RPSLI and Rowe LLC at the network benefit level, which is equal to the billed amount.

107)      Because Oxford issued a partial payment to RPSLI and Rowe LLC, Oxford acknowledged it was obligated to make payment to RPSLI and Rowe LLC.

108)       Oxford issued a partial payment that was not based upon the network benefit level.

109)      Oxford has failed and refused to issue payment to RPSLI and Rowe LLC at the the network benefit level for the services as offered by Oxford.

110)     Oxford has refused to pay the balance after being demanded to do so by RPSLI and Rowe LLC.

111)     As a result of Oxford's failure to perform under their agreement RPSLI and Rowe LLC has suffered damages.

## Second Cause of Action Unjust Enrichment

112)     RPSLI repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

113)     Oxford induced RPSLI and Rowe LLC to render bilateral breast reduction to TP by offering to reimburse bilateral breast reduction at the network benefit level.

114)     Oxford received the benefit of its bargain, i.e., RPSLI and Rowe LLC rendering bilateral breast reduction to TP.

115)     Oxford's failure to pay amounts due enriched them.

116)     Oxford's retention of the unpaid amount for the medical service provided, which is improper, is against equity and good conscience.

117)     RPSLI and Rowe LLC conferred a benefit upon Oxford under circumstances where Oxford knew or should have known that RPSLI and Rowe LLC expected to be reasonably compensated for the benefit conferred according to usual and customary prevailing rates for bilateral breast reduction, the services rendered to TP.

118)     RPSLI and Rowe LLC had no obligation to seek Oxford's approval prior to rendering bilateral breast reduction to TP.

119)     RPSLI and Rowe LLC would not have otherwise performed the surgery without Oxford's agreement to pay some or all of the costs.

120)     When RPSLI and Rowe LLC rendered bilateral breast reduction to TP RPSLI and Rowe LLC made it possible for Oxford to fulfill its contractual obligation to manage TP's costs for medically necessary services.

121)     Relying on Oxford's offer to make payment based on reimbursement at the network benefit level, RPSLI and Rowe LLC forbore from collecting payment in full from TP prior to rendering bilateral breast reduction.

122)     If Oxford did not issue the network exception then TP would not have received bilateral breast reduction from RPSLI and Rowe LLC.

123)     The additional benefits conferred by RPSLI and Rowe LLC when RPSLI and Rowe LLC agreed to render bilateral breast reduction based on Oxford's promise of payment included TP's perception, valid or otherwise, that Oxford facilitated TP receiving bilateral breast reduction from RPSLI and Rowe LLC when Oxford did not have a provider in its network with the same capacity at RPSLI and Rowe LLC and  TP was otherwise not entitled to receive that service from RPSLI and Rowe LLC; the esteem and the expectancy of TP's continued customer patronage is called good will and it has a value to Oxford.

124)     Under the circumstances, it would be unfair to permit Oxford to retain the benefits conferred upon it without Oxford paying a reasonable value to RPSLI and Rowe LLC.

## THIRD CAUSE OF ACTION- PROMISSORY ESTOPPEL

125)     RPSLI and Rowe LLC repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

126)     Oxford made a clear and unambiguous promise to reimburse bilateral breast reduction at the network benefit level if it was rendered to TP and should have expected that RPSLI and Rowe LLC would rely upon that promise.

127)     Oxford should have expected RPSLI and Rowe LLC to rely upon its promise because, among other reasons, Oxford knew or should have known that the surgery was scheduled for May 26, 2021 and it made an offer on March 18, 2021 to reimburse bilateral breast reduction at the network benefit level, and it sent correspondence to its consumer memorializing that offer.

128)     Oxford should have expected RPSLI and Rowe LLC to rely upon its promise because, among other reasons, Oxford issued numerous payments to RPSLI and Rowe LLC after issuing a network exception for the same healthcare services rendered by RPSLI and Rowe LLC at higher percentage of the billed amount under the same or similar circumstances.

129)     RPSLI and Rowe LLC relied on Oxford's promise to its detriment, causing substantial damages equal to the reasonable value of the medical services provided by RPSLI and Rowe LLC.

## FOURTH CAUSE OF ACTION— VIOLATION OF NEW YORK'S PROMPT PAY LAW

130)     RPSLI and Rowe LLC repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

131)     Pursuant to their agreement, and within 120 days of the date the services were rendered to TP, RPSLI and Rowe LLC electronically submitted its claim to Oxford.

132)     Oxford did not issue payment of the undisputed amount within 45 days of the date of service because the payment it issued was unreasonable based upon reimbursement standards in the industry.

133)     Moreover, Oxford admitted with its payment that it was not based on the network benefit level and therefore Oxford's payment could not be the undisputed amount

134)     Oxford did not object to reimbursement or request further information from RPSLI and Rowe LLC regarding RPSLI and Rowe LLC's billing within forty-five (45) days of receipt of the claim.

135)     RPSLI and Rowe LLC are entitled to payment of $142,619.50 PLUS interest at the rate of ONE PERCENT (1%) per month computed from THIRTY (30)

days after the date the claim was submitted to Oxford until the amount due is paid in full, pursuant to New York Insurance Law § 3224-a.

# FIFTH CAUSE OF ACTION— FRAUDULENT INDUCEMENT

136)     RPSLI and Rowe LLC repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

137)     Oxford intentionally represented to RPSLI and Rowe LLC that it would reimburse bilateral breast reduction as "in-network" to induce RPSLI and Rowe LLC to render that service to TP.

138)     Oxford knew that its product could not provide the medical services indicated for TP; services we now know Oxford determined to be necessary and covered because Oxford intentionally made a payment that it knew was not and could never be the agreed amount.

139)     When Oxford intentionally told RPSLI and Rowe LLC that it was reimbursing bilateral breast reduction as "in-network" Oxford knew that RPSLI and Rowe LLC had already rejected the out-of-network reimbursement to render bilateral breast reduction to TP offered by Oxford.

140)     When Oxford intentionally told RPSLI and Rowe LLC that it was reimbursing bilateral breast reduction as "in-network" Oxford knew there was no in-network rate. This action was intentionally deceptive because Oxford does not have an in-network rate for service provided by out-of-network providers.

141)      RPSLI and Rowe LLC justifiably relied on Oxford statements that it would reimburse the bilateral breast reduction as in-network, and as a result rendered bilateral breast reduction to Oxford.

142)      As a result of Oxford's willful and wonton conduct RPSLI and Rowe LLC has been damaged.

143)      Based on Oxford's willful and wonton conduct Oxford should be punished.

## SIXTH CAUSE OF ACTION-UHG'S UNJUST ENRICHMENT

144)      RPSLI and Rowe LLC repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

145)      As the owner of Oxford, Defendant UHG benefited from Oxford's failure to reimburse Rowe LLC and RPSLI the reasonable value of the services provided. In particular, UHG received dividends and administrative fees and reimbursements generated by Oxford's adjudication of Rowe LLC and RPSLI's medical claims.

146)      Because the benefits UHG received were at Rowe LLC and RPSLI's expense, equity and good conscience require restitution of said benefits to Plaintiffs

**WHEREFORE**, ROWE PLASTIC SURGERY OF LONG ISLAND, PC  &

NORMAN MAURICE ROWE, MD , MHA, LLC demands judgment in the

amount of $292,469.50 together with statutory interest and costs; or in the

alternative judgment in the amount of $232,469.50 together with pre-judgment

interested and costs , an award of punitive damages in an amount equal to treble

the judgment amount awarded together with granting such other and further

relief as the Court may deem just and proper.

**LEWIN & BAGLIO, LLP**
By: Brendan J. Kearns (BK3605)
Attorneys for the Plaintiff
1100 Shames Drive, Suite 100
Westbury, New York 11590
Tel:  (516) 307- 1777
Fax: (516) 307- 1770
bkearns@lewinbaglio.com
L&B File No.: 2132.COM.12